# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

NOLAN HETZ,

        Plaintiff,

     v.                                 Case No. 06-C-636

AURORA MEDICAL CENTER OF
MANITOWOC COUNTY,
AURORA HEALTH CARE,
ABC INSURANCE COMPANY, and
DEF INSURANCE COMPANY,

        Defendants.

---

## DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS

---

## I. BACKGROUND

This action was commenced on May 4, 2006, when the plaintiff, Nolan Hetz ("Hetz"), filed a complaint in Manitowoc County Circuit Court alleging that the defendants, Aurora Medical Center of Manitowoc ("Aurora"), Aurora Health Care, and unknown insurance companies violated Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182(a), and the Wisconsin public accommodations statute, Wis. Stat. § 106.52. Specifically, Hetz alleges that the defendants violated the ADA and Wis. Stat. § 106.52 by denying his application for medical staff privileges at Aurora because of his bipolar disorder and sleep apnea. On May 30, 2006, the defendants removed this action to the United States District Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1441.

On March 28, 2007, the defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), alleging that Hetz's complaint fails to state a claim upon which relief can be granted. The defendants contend that Title III does not cover Hetz's claims because Title III only offers protections to a public entity's clients or customers, and not to its employees or independent contractors. Moreover, the defendants assert that Wis. Stat. § 106.52 likewise does not cover Hetz's claims because Aurora was not acting as a place of public accommodation within the meaning of the statute when considering Hetz's application for medical staff privileges. The defendants' motion to dismiss has been fully briefed and is ready for resolution. For the reasons which follow, the defendants' motion will be granted in part and denied in part.

## II. DISCUSSION

A motion pursuant to Rule 12(b)(6), Fed. R. Civ. P., requires the court to decide whether the plaintiff's pleadings actually state a claim upon which relief can be granted. For the purposes of a motion to dismiss, all factual allegations of the complaint are taken as true. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *Eison v. McCoy*, 146 F.3d 468, 470 (7th Cir. 1998). Such allegations must be viewed liberally and in the light most favorable to the plaintiff. *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999). "'[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 526 (7th Cir. 1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). However, the court is not required to ignore any facts alleged in the complaint that undermine the plaintiff's claim or to assign weight to unsupported conclusions of law. *Gray v. County of Dane*, 854 F.2d 179, 182 (7th Cir. 1988).

2

## A. Title III of the ADA

The defendants contend that Title III only protects the "clients or customers" of a place of public accommodation, and that Hetz, as an independent contractor, was not a "client or customer." In response, Hetz argues that the language of Title III does not limit its protection to only "clients or customers," and that regardless, he can still properly be classified a "client or customer" of the hospital, i.e., medical center.

Title III of the ADA provides that: "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . ." 42 U.S.C. § 12182(a).

The ADA defines "public accommodation" as including:

A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

3

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7).

The Seventh Circuit has stated that "[t]he core meaning of this provision, plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space), that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 558-59 (7th Cir.1999).

The defendants argue that Title III only protects those who enjoy the benefits that the public accommodation holds out to the public, namely, the goods or services which make the entity a public accommodation. Thus, according to the defendants, Title III only applies to the "clients or customers" of a public accommodation. (Def.'s Br. at 5.) In support of this interpretation, the defendants point to a variety of factors: the language of the statute, the overall structure of the ADA, interpretive regulations of the U.S. Department of Justice, legislative history, and the common law understanding of public accommodations.

To begin with, the defendants point to Title III's list of definitions of entities under 42 U.S.C. § 12181(7) which are considered a "place of public accommodation," and argue that in light of these

4

definitions, it is clear that the "goods, services, facilities, privileges, advantages, or accommodations" of the public accommodations are the benefits the public accommodation offers to the public. For example, the defendants cite the inclusion of "a restaurant, bar, or other establishment serving food or drink," and contend that this definition indicates that the benefit offered by a restaurant or bar is the service of "food or drink." Thus, according to the defendants, the benefit provided by the hospital is the service it provides, namely health care. The defendants argue that the services provided by the hospital are not opportunities for employment or independent contracting. (Def.'s Br. at 5.)

The defendants also cite § 12182(b) of the ADA, entitled "Construction," which describes the general prohibition on discrimination relating to activities of a public accommodation, and which explicitly uses the phrase "clients or customers":

> (iv) Individual or class of individuals. For purposes of clauses (i) through (iii) of this subparagraph, the term "individual or class of individuals" refers to the clients or customers of the covered public accommodation that enters into the contractual, licensing or other arrangement.

42 U.S.C. § 12182(b)(1)(a)(iv).

Although the defendants concede that this section does not import a "client or customer" limitation on Title III's general prohibition of discrimination, the defendants argue that it does indicate that the scope of Title III's protections as a whole assumes that an underlying condition to the general prohibition of discrimination extends only to clients or customers. (Def.'s Br. at 6.)

In addition to citing the language of Title III itself, the defendants also argue that extending Title III beyond clients and customers would render meaningless the framework of the ADA, including numerous provisions of Title I. (Def.'s Br. at 6.) Specifically, the defendants argue that

5

Title I is the exclusive province of employment-related claims, and that extending Title III's protections to employment-related claims would muddle the structure of the ADA.

Title I of the ADA forbids certain employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). However, Title I only provides protection for employees, and not for independent contractors. Indeed, the Seventh Circuit has expressly held that "[t]he ADA protects 'employees' but not independent contractors." *Aberman v. J. Abouchar & Sons*, 160 F.3d 1148,1150 (7th Cir. 1998) (quoting *Birchem v. Knights of Columbus*, 116 F.3d 310, 312 (8th Cir. 1997)). The parties do not dispute that Hetz would be considered an independent contractor rather than an employee. *See Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (holding that an anesthesiologist with staff privileges at a hospital was an independent contractor); *Alexander v. Rush North Shore Medical Center*, 101 F.3d 487, 492 (7th Cir. 1996) (same).[1]

The defendants argue that a number of absurdities would result if Hetz were allowed to proceed under Title III as an independent contractor seeking employment, and thus would confuse the framework of the ADA. First, the defendants contend that interpreting Title III to cover employment related claims would expose small businesses to liability from which Congress intended

---

[1]For purposes of this motion, I will assume that Hetz was seeking staff privileges similar to those of other physicians with staff privileges as noted in *Vakharia* and *Alexander*: namely that Hetz would have authority to exercise his own independent discretion concerning patient care, that he would be self-employed for tax purposes, that he would be responsible for paying his own malpractice insurance and employment benefits, and that he would bill his patients and collect fees from them directly.

6

to exempt them in Title I.  *See* 42 U.S.C. § 12111(5)(A) (employers with less than 15 employees are not subject to the requirements of Title I).

Second, the defendants argue that allowing an employment-related claim under Title III would allow workers to circumvent the administrative procedures outlined in Title I, as Title III does not require seeking administrative relief as a prerequisite to court access.  Lastly, the defendants contend that expanding employment-related claims to Title III would provide protection for the claims of independent contractors, whom Congress specifically sought to exclude from protection in Title I.  (Def.'s Br. at 7.)

The defendants also point to interpretive regulations to support their argument that the structure of the ADA precludes the applicability of Title III.  The defendants first cite a regulation by the U.S. Department of Justice which addresses whether wholesale establishments are "sales or rental establishments" for purposes of being a "public accommodation" under Title III.  The regulation states that the Department

> intends for wholesale establishments to be covered under this category as places of public accommodation except in cases where they sell exclusively to other businesses and not to individuals. For example, a company that grows food produce and supplies its crops exclusively to food processing corporations on a wholesale basis does not become a public accommodation because of these transactions. If this company operates a road side stand where its crops are sold to the public, the road side stand would be a sales establishment covered by the ADA. . . .

> Of course, a company that operates a place of public accommodation is subject to this part only in the operation of that place of public accommodation. In the example given above, the wholesale produce company that operates a road side stand would be a public accommodation only for the purposes of the operation of that stand. The company would be prohibited from discriminating on the basis of disability in the operation of the road side stand.

28 C.F.R. § 36.104, App. B, p. 678 (2004)

Case 1:06-cv-00636-WEC   Filed 06/18/07   Page 7 of 30   Document 27

Given this regulation, the defendants argue that extending Title III protection to an independent contractor would create an arbitrary distinction between which independent contractors would be covered under the ADA, which distinction would be based solely on where they happened to work. According to the defendants, if Title III covered independent contractors, under the regulation an independent contractor who worked at a road side stand would be covered by Title III, but an independent contractor who worked in other areas of the wholesale produce company would not be covered. (Def.'s Br. at 8.)

The defendants point to other regulations to further support their argument. The defendants cite a regulation which states that a "public accommodation . . . is not liable under this provision for discrimination that may be practiced by those with whom it has a contractual relationship, when that discrimination is not directed against its own clients or customers." 28 C.F.R. § 36.104, App. B, p. 694 (2006). Additionally, the defendants cite a regulation which states: "[t]he purpose of the ADA's public accommodations requirements is to ensure accessibility to the goods offered by a public accommodation." 28 C.F.R. § 36.104, App. B, p. 713 (2006). Both of these regulations, according to the defendants, indicate that the purpose of Title III is to ensure access to the goods offered to the public by a public accommodation, rather than to employees or independent contractors.

The defendants also argue that the legislative history of the ADA supports their conclusion that Title III does not apply to Hetz's claims. The defendants first cite Senate and House Reports which distinguish the scope of Title III from that of Title I. *See, e.g.*, S. Rep. No. 101-116, at 58 (1989); H.R. Rep. 101-485, Part 2, at 99 (1990) ("Title III is not intended to govern any terms or conditions of employment by providers of public accommodations or potential places of employment; employment practices are governed by Title I of this legislation.").

8

The defendants also cite legislative history which discusses the reasons for Title III's enactment, and which lists specific situations in which Title III applies. The defendants note that in congressional findings relating to public accommodations, Congress noted that many people with disabilities "do not go to movies, do not go to the theater . . . never go to a restaurant, never go to a grocery store." H.R.Rep. No. 101-485 (II), pt. 2, at 3436. These findings also noted discrimination against people with disabilities "at the pharmacy where they need to fill a prescription. *Id*.

In regards to specific situations covered by Title III, Congress in its House Reports included such situations as: a child with mobility impairments participating in recreational programs, a person with Down Syndrome eating at a diner, a blind individual touring a museum, and deaf individuals seeking treatment from a physician. H.R.Rep. No. 101-485 (II), pt. 2, at 102-106.

Finally, the defendants argue that a narrow construction of Title III is consistent with the historical scope of public accommodation laws, which provided rights to customers. *See, e.g., Hurley v. Irish-Am, Gay, Lesbian & Bisexual Group*, 515 U.S. 557, 571 (1995) ("At common law, innkeepers, smiths, and others who made 'profession of a public employment,' were prohibited from refusing, without good reason, to serve a customer."); 42 U.S.C. § 2000a(b) (defining a "public accommodation" as an "establishment[] which serves the public.").

In response, Hetz argues that the plain language of Title III of the ADA provides protection to more than mere clients or customers of a public accommodation. Rather, according to Hetz, the language stating that "[n]o individual shall be discriminated against . . ." indicates that any individual seeking to obtain the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation is protected by Title III. (Pl.'s Br. at 2.)

9

In regards to the contention that Title I would be eviscerated by extending protection to independent contractors under Title III, Hetz argues that his use of the hospital was work-related, rather than employment-related. According to Hetz, rather than being in an employment relationship to provide services for the employer, Hetz was seeking the use of the hospital's privileges and facilities for his own benefit. (Pl.'s Br. at 4.)

Hetz also emphasizes that the ADA was intended to create a broad, general prohibition against discrimination. As noted by the Supreme Court, the ADA provides a "broad mandate," and "one of the Act's 'most impressive strengths' has been identified as its 'comprehensive character.'" *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (citing Hearings on S. 933 before the Senate Committee on Labor and Human Resources and the Subcommittee on the Handicapped, 101st Cong., 1st Sess., 197 (1989) (statement of Attorney General Thornburgh).

Although the Supreme Court and Seventh Circuit have not addressed the question whether an independent contractor could be covered by the protections of Title III, other courts, including the dissent in *Martin*, have addressed this situation. These courts have split on the issue.

To support his position, Hetz primarily relies on *Menkowitz v. Pottstown Memorial Medical Center*, which involved a situation essentially identical to the situation at hand in this case. 154 F.3d 113 (3rd Cir. 1998). The court in *Menkowitz* held that "a medical doctor with staff privileges -- one who is not an employee for purposes of Title I -- may assert a cause of action under Title III of the ADA as an 'individual' who is denied the 'full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.'" *Id.* at 122.

The plaintiff in *Menkowitz* was a medical doctor with staff privileges who worked at a private community hospital. *Id.* at 115. The hospital suspended the plaintiff's staff privileges for six months

10

for various alleged infractions of hospital policies, and the plaintiff subsequently brought action under Title III alleging that the hospital discriminated against him due to his attention-deficit disorder. *Id*. The district court dismissed the complaint, concluding that Title III only protects individuals who patronize places of public accommodation, and that in the context of health care, Title III only protects those individuals seeking medical care, and not the employees and staff who provide medical care. *Id*.

In reversing the district court, the Court of Appeals concluded that "[a]s both the language of Title III and its legislative history clearly demonstrate, the phrase 'clients or customers,' which only appears in 42 U.S.C. § 12182(b)(1)(A)(iv), is not a general circumscription of Title III and cannot serve to limit the broad rule announced in 42 U.S.C. § 12182(a)." *Id*. at 121. Thus, the court in *Menkowitz* declined to accept a "blanket interpretation that Congress intended Title III to apply only to members of the 'public,' which the district court defined as those guests, clients, or customers who seek the services, facilities, or privileges offered by a place of public accommodation." *Id*.

The court in *Menkowitz* acknowledged the use of the phrase "clients or customers" in 42 U.S.C. § 12182(b)(1)(A)(iv), but concluded that this phrase "was not intended to restrict the general class of persons entitled to sue under Title III." *Id*. at 119. Rather, the court concluded that "Congress intended the phrase 'customers or clients of the covered public accommodation that enters into a contractual, licensing or other arrangement,' 42 U.S.C. § 12182(b)(1)(A)(iv), to encompass the relatively narrower situation where several entities enter into a contractual or other relationship." *Id*.; *see also Martin*, 532 U.S. at 661 ("As petitioner recognizes, clause (iv) is not literally applicable to Title III's general rule prohibiting discrimination against disabled individuals. Title III's broad general rule contains no express "clients or customers" limitation, § 12182(a), and §

11

12182(b)(1)(A)(iv) provides that its limitation is only 'for purposes of' the clauses in that separate subparagraph.").

The court in *Menkowitz* also rejected the argument that "illustrations cited by the ADA's legislative history all describe instances of members of the public as clients or customers." *Id*. at 121. Instead, the court noted "[t]hat a statute can be 'applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.' *Id*. (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)).

To reinforce its conclusion, the court in *Menkowitz* made three additional observations. First, the court noted that it "may effectively find no recourse under the ADA for the appellant if we were to hold that he has no cause of action under Title III." *Id*. at 122. The court found this result unacceptable in stating "[w]e cannot see how Congress intended such a result given the ADA's remarkable breadth of language and purpose -- especially when Congress expressly states that it seeks to comprehensively regulate 'discrimination against individuals with disabilities in such critical areas as . . . health services.' *Id*. at 123.

Second, the court observed that because "nothing in the Rehabilitation Act would prevent a physician with staff privileges from asserting a cause of action based on disability discrimination . . ., [n]ot finding a similar cause of action under the ADA would lead to the perverse result that the ADA affords less protection than the Rehabilitation Act to a discrete class of disabled individuals." *Id*.

Third, the court noted that "the administrative guidance issued by the Justice Department interprets Title III to allow a cause of action for physicians with staff privileges." *Id*. The court accorded deference to this administrative guidance, because the Justice Department is the "agency

12

charged by Congress to issue implementing regulations." *Id*. Specifically, the Title III Technical Assistance Manual distributed by the U.S. Department of Justice, Civil Rights Division, offers the following as an example of a situation covered by Title III:

> A committee reviews applications from physicians seeking "admitting privileges" at a privately owned hospital. The hospital requires all applicants, no matter their specialty, to meet certain physical and mental health qualifications, because the hospital believes they will promote the safe and efficient delivery of medical care. The hospital must be able to show that the specific qualifications imposed are necessary.

U.S. Dep't of Justice, Civil Rights Division, The Americans with Disabilities Act: Title III Technical Assistance Manual P 4.1100, illus. 4 (Nov. 1993).

The court in *Menkowitz* did acknowledge that "it is apparent that Congress did not intend Title III -- despite the breadth of its language -- to govern discrimination within the employment setting and we cannot construe Title III in a manner that would eviscerate such a salient legislative mandate." *Id*. at 119. However, the court in *Menkowitz* emphasized that the situation before it did not involve an employment relationship, but was rather in the nature of the relationship between an independent contractor and the entity or person with whom he has a contract. As such, the court concluded that the plaintiff's claim was not within the province of Title I. *Id*. at 122.

As noted by the defendants, other courts, and Justice Scalia, have reached conclusions in direct contrast to the decision in *Menkowitz*. The defendants first cite Justice Scalia's dissent in *Martin*.

In *Martin*, the Supreme Court held that Title III of the ADA protects access to professional golf tournaments open to the public by a qualified entrant with a disability. 532 U.S. at 679-80. The plaintiff in *Martin* sought an accommodation from the PGA TOUR allowing him to use a golf cart

Case 1:06-cv-00636-WEC   Filed 06/18/07   Page 13 of 30   Document 27

due to his disability. *Id*. at 668. At issue was whether a professional golf tournament, which was open to qualified members of the public, constituted a place of public accommodation under Title III, and whether Title III provided protections for a player in the tournament. *Id*. at 675-76. The golf tournament at issue in *Martin* was a three-stage qualifying tournament, and any member of the public could enter the tournament by paying a $3,000 entry fee and submitting two letters of reference. *Id*. at 665.

The Supreme Court first concluded that the PGA tournament was a place of public accommodation under Title III, as the event was on a golf course, a place specifically identified in Title III as a place of public accommodation. *Id*. at 677. Thus, according to the Court, the PGA could "not discriminate against any 'individual' in the 'full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations' of those courses." *Id*. The court concluded that among the privileges offered by the PGA on its courses was the privilege of competing and playing in the tournaments. *Id.*

Although the PGA argued that Title III only protects "clients or customers" of a public accommodation, the Court declined to specifically address this issue. *Id*. at 679. Rather, the Court concluded that, even if Title III only applied to "clients or customers," the plaintiff was a client or customer of the PGA TOUR events. *Id*. In reaching this conclusion, the Court reasoned that the PGA tournaments offered two privileges to the general public, both that of watching the tournament and that of competing in it. *Id*. at 680. Even though competing in the tournament was a more difficult privilege to obtain, it was still a privilege available to the general public. *Id*.

In his dissenting opinion, Justice Scalia reasoned that Title III does not bear an interpretation that "the employees and independent contractors of every place of public accommodation come

14

within Title III: The employee enjoys the 'privilege' of employment, the contractor the 'privilege' of the contract." *Martin*, 532 U.S. at 692 (Scalia, J., dissenting). Rather, according to Justice Scalia, Title III "covers only clients and customers of places of public accommodation." *Id*. (Scalia, J., dissenting). In support of his position, Justice Scalia recited the arguments raised by the defendants in this case. Specifically, Justice Scalia pointed to the traditional understanding of public-accommodation laws, the text of Title III itself, regulations promulgated by the Department of Justice, and the structure of the ADA as a whole.

Justice Scalia first noted that "the traditional understanding of public-accommodation laws [is] that they provide rights for customers." *Id*. at 692. Justice Scalia then reasoned that this traditional understanding is supported by the text of Title III and its list of entities that qualify as "public accommodations." For example, Justice Scalia noted that Title III covers an "auditorium" or "other place of public gathering," and concluded that "'gathering' is the distinctive enjoyment derived from an auditorium; the persons 'gathering' at an auditorium are presumably covered by Title III, but those contracting to clean the auditorium are not." *Id*.

Justice Scalia also pointed to regulations promulgated by the Department of Justice, which state that "'[t]he purpose of the ADA's public accommodations requirements . . . is to ensure accessibility to the goods offered by a public accommodation.'" *Id*. (quoting 28 CFR, Ch. 1, pt. 36, App. B, p. 650 (2000). Finally, Justice Scalia observed that extending Title III protections beyond clients and customers would "make a muddle of the ADA as a whole." According to Justice Scalia, "[i]t is an entirely unreasonable interpretation of the statute to say that these exemptions so carefully crafted in Title I are entirely eliminated by Title III (for the many businesses that are places of public accommodation) because employees and independent contractors 'enjoy' the employment and

15

contracting that such places provide." *Id*. Moreover, as stated by Justice Scalia, "[t]he only distinctive feature of places of public accommodation is that they accommodate the public, and Congress could have no conceivable reason for according the employees and independent contractors of such businesses protections that employees and independent contractors of other businesses do not enjoy." *Id*.

The defendants also cite *Bauer v. Muscular Dystrophy Ass'n, Inc.*, in which the court rejected the reasoning of the Third Circuit in *Menkowitz* and adopted the reasoning of Justice Scalia in *Martin*. 268 F. Supp. 2d 1281 (D. Kan. 2003). In *Bauer*, the court held that individuals with muscular dystrophy seeking to be volunteers at a summer camp were "not individuals who have been denied the 'enjoyment' of the 'goods, services, facilities, privileges, advantages, or accommodations' of a place of public accommodation within the meaning of Title III of the ADA." *Id*. at 1291. The court concluded that "the right of equal access to the 'goods, services, facilities,' et cetera, guaranteed by Title III is most reasonably construed to mean the goods, services and facilities *offered to customers or patrons* of the public accommodation, not to individuals who work at the facility, whether those workers be paid employees, independent contractors, or unpaid volunteers. *Id*. (emphasis in the original).

The court in *Bauer* cited Justice Scalia's dissent in *Martin*, and echoed Justice Scalia's reasoning in determining that Title III's protections extend only to the customers or patrons of the public accommodation. *Id*. at 1291-92. The court also noted that the majority opinion in *Martin* did not reject Justice Scalia's argument that "individuals who work at places of public accommodation are outside the scope of Title III's coverage." *Id*. at 1292. Rather, according to the court in *Bauer*,

16

the *Martin* majority opinion "reiterated that the plaintiff was a customer of the PGA Tour rather than an applicant for a job." *Id*.

The defendants also cite *Wojewski v. Rapid City Reg'l Hosp*., Inc. in support of their argument. 394 F.Supp. 2d 1134 (D.S.D. 2005). In *Wojewski*, the court held that the plaintiff did "not qualify as an 'individual' for purposes of Title III because he is not a client or customer." *Id*. at 1145. The plaintiff in *Wojewski* was a physician with staff privileges whose privileges were terminated after taking a leave of absence due to his bipolar disorder. *Id*. at 1138. In reaching its conclusion, the court in *Wojewski* relied on *Bauer* and Justice Scalia's dissent in *Martin*, recounting the analyses presented in both cases and adopting their conclusions. *Id*. at 1143-45. The court in *Wojewski* acknowledged that the court in *Menkowitz* reached a different conclusion, but rejected its reasoning by finding that it was decided prior to *Martin* and was contrary to *Bauer*. *Id*. at 1144.

As an initial matter, neither party disputes whether Title III governs employment-related actions. Both parties agree that Title I is the exclusive province of employment-related claims, and that expanding protection to actions arising out of employment would be improper. However, Hetz contends that work-related claims are separate from employment-related claims, and that providing protection for work-related claims under Title III would not gut the provisions of Title I. Hetz argues that, unlike an employee, he is seeking use of the hospital's privileges and facilities primarily for the benefit of his own work, rather than for the benefit of the hospital.

I conclude that, under the plain language of the statute, Title III does provide protection for an independent contractor in such a situation, irregardless of whether such individual could be considered a "client or customer" of the place of public accommodation. Moreover, I conclude that, even if I were to accept the defendant's narrow interpretation of Title III's protections, Hetz could

Case 1:06-cv-00636-WEC   Filed 06/18/07   Page 17 of 30   Document 27

still properly be classified as a "client or customer" of the hospital. Such being the case, Hetz, as an individual who was not being paid by the hospital for his services and was using the hospital's facilities primarily for his own benefit, is protected by Title III. This conclusion is supported by the plain language of Title III, its expansive purpose, and interpretative guidelines promulgated by the U.S. Department of Justice.

To begin with, the plain language of Title III does not limit Title III's protections to only "clients or customers." Rather, Title III's "broad general rule contains no express 'clients or customers' limitation." *Martin*, 532 U.S. at 679. Title III uses only the general term "individual," which on its face appears to cover a doctor applying for staff privileges. To be sure, the phrase "clients or customers" is used in § 12182(b)(iv) to define "individual or class of individuals" as used in clauses (i) through (iii) of subparagraph b. However, as noted by the courts in *Martin* and *Menkowitz*, the phrase "clients or customers" is a limitation "only 'for purposes of' the clauses in that separate subparagraph." *Martin*, 532 U.S. at 679. Indeed, Congress' use of the phrase "clients or customers" in a specific section of Title III would seem to lend support to the argument that Congress did not intend the word "individual" to be synonymous with "client or customer."

Under the plain language of the statute, Aurora's offer of staff privileges fits within the coverage of Title III, and Hetz falls within Title III's protection. *See Martin*, 532 U.S. at 677 ("It seems apparent, from both the general rule and the comprehensive definition of 'public accommodation,' that petitioner's golf tours and their qualifying rounds fit comfortably within the coverage of Title III, and Martin within its protection."). Aurora, as a hospital, is specifically listed as a place of public accommodation. Thus, Aurora, under the plain language of Title III, cannot discriminate against any "individual" based on disability "in the full and equal enjoyment of [its]

18

goods, services, facilities, privileges, advantages, or accommodations." Hetz, as an "individual" under the statute, was entitled to the full enjoyment of the privileges and facilities offered by Aurora. This includes enjoyment of the offer of obtaining staff privileges, and the enjoyment of the hospital's offer of its facilities for the benefit of Hetz's own practice.

The use of the general term "individual" rather than "client or customer" accurately reflects the expansive purpose of the ADA. As noted by the court in *Martin*, "Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." 532 U.S. at 674. In enacting the ADA, "Congress noted that the many forms such discrimination takes include 'outright intentional exclusion.'" *Id*. Moreover, "the phrase 'public accommodation' is defined in terms of 12 extensive categories, which the legislative history indicates 'should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to the nondisabled. *Id*. (citing S. Rep. No. 101-116, at 59; H. R. No. 101-485, pt. 2, at 100). Hetz is alleging "outright intentional exclusion" due to his disability, and is protected by Title III under the plain language of the statute. Given the expansive purpose of the ADA and the expansive definitions of what constitutes a "public accommodation," it seems inappropriate to insert a limiting parameter which may exclude an individual from the ADA's protections who otherwise qualifies under the plain language of the statute.

I hasten to add that, although I conclude that individuals, such as Hetz, who are seeking medical staff privileges are covered by Title III, this does not mean that all independent contractors are necessarily also covered. Unlike in other independent contractor relationships, the hospital is in essence simply offering its facility as a place of practice for an independent doctor. The hospital does not pay the physician, who bills his own patients and collects fees from them directly. The physician

19

thus works for himself rather than for the hospital, and receives the primary benefit from his use of the hospital's facilities (although, as Hetz acknowledges, the hospital does benefit vicariously). Such being the case, the relationship between the hospital and the physician seeking staff privileges fits squarely within the language of Title III, as the physician is seeking the enjoyment of the hospital's facilities.

In contrast, an individual who is hired and paid to perform services primarily for the benefit of the place of public accommodation may very well not fall under the protections of Title III. It is unclear whether an individual who seeks to provide services for a place of public accommodation is seeking the "enjoyment" of that entity's privileges or facilities.[2] For purposes of this case, however, it is unnecessary to discuss whether independent contractors in general are covered by Title III.

The conclusion that a doctor seeking medical privileges is protected by Title III is further supported by regulations promulgated by the U.S. Department of Justice, as noted in *Menkowitz*. To be sure, the defendants have cited to regulations promulgated by the U.S. Department of Justice, such as those referencing a wholesale produce company, which the defendants argue indicate the *potential* illogical results that could occur if independent contractors were covered by Title III. However, the U.S. Department of Justice's Technical Assistance Manual *explicitly* lists the situation in this case, namely that of a physician applying for staff privileges, as a being of the type covered by Title III. Such being the case, although the Department of Justice in its regulations states that the purpose of Title III "is to ensure accessibility to the goods offered by a public accommodation," the

---

[2]For example, it is unclear whether a painter hired to paint the hospital could be considered to be "enjoying" the use of the hospital's facilities, or "enjoying" the privilege of performing work for the hospital.

20

corresponding technical assistance manual indicates that medical staff privileges are among the "goods" being offered by a hospital. 28 CFR, Ch. 1, pt. 36, App. B, p. 650 (2000).

This conclusion is also not undermined by the history of public accommodation laws, the legislative history of the ADA, or the structure of the ADA. To begin with, the history of public accommodations laws does not preclude the interpretation that Title III applies to more than simply "customers or clients." Congress enacted the ADA to provide "a clear and comprehensive national mandate" in order to "remedy widespread discrimination against disabled individuals." *Martin*, 532 U.S. at 674; S. Rep. No. 101-116, p. 20 (1989); H. R. Rep. No. 101-485, pt. 2, p. 50 (1990). Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, *despite some improvements*, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2) (emphasis added). As such, the ADA was not enacted simply to adopt existing public accommodations laws, but rather to expand their coverage.

Indeed, a comparison of the ADA and existing state public accommodations laws illustrates this point. The defendants cite *Samuels v. Rayford*, in which the court held that a physician was not covered by the public accommodations provision of the District of Columbia's discrimination statute. 1995 WL 376939 at *8 (D.D.C. 1995). The statute at issue in that case read that "place of public accommodation . . . shall not include any ... place of accommodation which is in its nature distinctly private." D.C.Code Ann. § 1-2502(24). Given this statute, the court concluded that because the hospital was selective in granting privileges, the case did not fall under the statute. 1995 WL 376939 at *8. However, in contrast, Title III specifically lists "postgraduate private school," which is an entity which would offer its services to only a highly select segment of the general public, as a place

21

of public accommodation. A postgraduate private school would not be a place of public accommodation under the District of Columbia's discrimination statute.

Further, legislative history indicating that Congress primarily envisioned Title III to apply to "customers or clients" does not lead to the conclusion that the plain meaning of the statute should be narrowed. Rather, as noted above, "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998). Moreover, the legislative history noting that the definition of public accommodation should be "construed liberally" further indicates that Congress, despite providing a detailed list of places of public accommodation, did not envision all of the circumstances under which Title III may be properly applied.

Interpreting the language of Title III to apply to "individuals" seeking staff privileges also does not eviscerate Title I. There is no overlap of protections, as Hetz is not an employee of the hospital entitled to the protections of Title I. Moreover, this interpretation does not create the absurd consequences envisioned by the defendants, as I am not concluding that all independent contractors would necessarily be covered by Title III. Hetz's situation is materially different from the situation in which a small business hires and pays an independent contractor to provide services for that business. Similarly, in regards to the wholesale establishments regulation cited by the defendants, Hetz's situation is materially different from that of independent contractors working at a roadside stand or in a warehouse. Again, these independent contractors are primarily providing services for, rather than receiving services from, the place of public accommodation. Whether these types of independent contractors are covered by Title III is outside the scope of this court's conclusion that Hetz is protected by Title III.

22

Furthermore, this interpretation does not mean that certain independent contractors are being allowed to circumvent the requirements of Title I by bringing suit under Title III. The obligations of an employer under Title I and the obligations of a place of public accommodation under Title III are different from one another. Thus, Hetz is not circumventing the requirements of Title I in order to receive the protections offered to employees under Title I. Rather, Hetz, as an individual seeking access to the privileges and facilities offered by the hospital, is merely entitled to the same protections provided to other individuals covered by Title III.

The defendants, as well as the courts in *Bauer* and *Wojewski*, seem to maintain that the *Menkowitz* court's reasoning is no longer applicable given the Supreme Court's decision in *Martin*. However, the majority in *Martin* was silent as to whether Title III limits its protections to "clients or customers," and Justice Scalia's dissent is not controlling precedent. The fact that the majority did not explicitly reject Justice Scalia's position does not mean that the majority was implicitly accepting Justice Scalia's reasoning. Rather, the majority explicitly stated it was not going to address the issue.[3]

---

[3]To the extent that it addressed Justice Scalia's reasoning, the majority stated:

Contrary to the dissent's suggestion, our view of the Q-School [Qualifying School] does not make 'everyone who seeks a job' at a public accommodation, through 'an open tryout' or otherwise, 'a customer.' . . . Unlike those who successfully apply for a job at a place of public accommodation, or those who successfully bid for a contract, the golfers who qualify for petitioner's tours play at their own pleasure (perhaps, but not necessarily, for prize money), and although they commit to playing in at least 15 tournaments, they are not bound by any obligations typically associated with employment.

*Martin*, 532 U.S. at 680 n.33.

23

To be sure, the *Bauer* court concluded that "while the Martin Court did not expressly find that the 'privileges' guaranteed by Title III meant only those privileges offered to customers or patrons of the public accommodation, the Court certainly implied as much by its disposition of the plaintiff's claim." 268 F. Supp. 2d at 1292. However, it is unclear to me how the Supreme Court majority's decision to decline to address this issue could be read as an implicit acceptance of Justice Scalia's dissent.

Moreover, the language in the majority opinion seems to provide support for the argument that the term "individual" in Title III does not only apply to "customers or clients." Indeed, the Supreme Court noted that "Title III's broad general rule contains no express 'clients or customers' limitation, § 12182(a), and § 12182(b)(1)(A)(iv) provides that its limitation is only 'for purposes of' the clauses in that separate subparagraph." *Martin*, 532 U.S. at 679.

Although I conclude that Hetz is entitled to the protections of Title III under the plain language of the statute, even if Title III were to be construed as only providing protection for "clients or customers," Hetz could still be classified as a "client or customer" of Aurora. To be sure, the primary service offered by a hospital is medical services to the general public, and the primary "clients or customers" of Aurora are individuals seeking medical services. However, an entity is not limited to offering only one type of privilege or service to the public, or limited to offering only the service typically associated with that type of entity. In the case at hand, Aurora offers to the public both the privilege of receiving medical services, as well as the privilege of using the hospital's facilities for a doctor's personal practice.

This broad understanding of what constitutes a "client or customer" is consistent with the majority's opinion in *Martin*. Indeed, as noted in *Martin*, an entity can provide multiple privileges

24

to different members of the public, and an individual receiving one privilege may simultaneously be providing the entity's privilege to other individuals. In *Martin*, the individual was receiving the privilege of playing in the tournament, while also providing entertainment for the spectators. Although the privilege most commonly associated with a professional golf tournament might be the privilege of watching it, the tournament also offers the more limited privilege of playing in it to qualified members of the public. As stated by the majority in *Martin*, "[i]t would be inconsistent with the literal text of the statute as well as its expansive purpose to read Title III's coverage, even given petitioner's suggested limitation, any less broadly."

Similarly to the situation in *Martin*, the fact that Hetz is also providing medical services to the hospital's other customers does not preclude him from being a "client or customer" seeking access to a separate privilege offered by the hospital, in this case staff privileges. Although staff privileges may not be the privilege normally associated with a hospital, it is nevertheless still a privilege offered by the hospital to qualified members of the public. Furthermore, as with the situation in *Martin*, the fact that a privilege is only open to certain qualified members of the public does not preclude these qualified individuals from being considered "clients or customers."

To be sure, the majority in *Martin* indicated that an individual seeking employment, or an individual under obligations typically associated with employment, would not be considered a "client or customer" of a place of public accommodation. However, Hetz was not seeking a job at the hospital, and unlike the typical employment situation, was not performing services primarily for the benefit of the hospital.

In sum, Hetz has stated a claim under Title III of the ADA. As an "individual" seeking the full enjoyment of the privileges and facilities offered by Aurora to the public, he is entitled to the

25

protections offered by Title III. Such being the case, as to Hetz's claim under the ADA, the defendants' motion to dismiss will be denied.

**B. Wisconsin Public Accommodation Statute**

The defendants also argue that Hetz is not protected by Wisconsin's public accommodation statute, Wis. Stat. § 106.52. That statute includes hospitals in its list of places of public accommodation covered by the statute: "'Public place of accommodation or amusement' shall be interpreted broadly to include, but not be limited to, . . . hospitals . . . and any place where accommodations, amusement, goods or services are available either free or for a consideration." Wis. Stat. § 106.52(e)(1).

Under the statute, no person may "[d]eny to another . . . the full and equal enjoyment of any public place of accommodation or amusement because of . . . disability." Wis. Stat. § 106.52(3)(a)(1).

The defendants first contend that the Wisconsin statute only protects access to the "places" of public accommodation, and to the goods and services the place offers in its capacity as a public accommodation. (Def.'s Br. at 16.) Moreover, the defendants argue that an entity which uses selective criteria to determine whether an individual is entitled to access is not acting as a place of public accommodation within the meaning of the statute. In support of their arguments, the defendants cite a Wisconsin Court of Appeals case, as well as a decision by the Wisconsin Labor and Industry Review Commission ("LIRC").

In *Barry v. Maple Bluff Country Club*, the Wisconsin Court of Appeals held that an individual's access to the governing body or committee of a country club was not covered by Wisconsin's public accommodations statute because the country club, as a corporation, was not a

26

"place." 221 Wis. 2d 707, 716, 586 N.W.2d 182, 186 (Wis. Ct. App. 1998). The plaintiff did, however, state a claim in regards to whether there was preferential treatment in access to the golf course and amenities in the country club. *Id*. at 729, 586 N.W.2d at 191.

In *Wolff v. Middleton Basketball Club, Inc*., the LIRC held that Wisconsin's public accommodations statute did not cover an individual who applied to serve as a volunteer assistant coach in a basketball club. ERD Case No. 200401370 (March 11, 2005). In adopting the findings of the ALJ, the Commission reasoned that the "place" of public accommodation was the gym in which the team was playing, and the "service or amusement" was the opportunity to observe the training or game, and not the opportunity to coach the team. *Id*. at 3. Moreover, the Commission concluded that Wis. Stat. § 106.52 protected an individual's access to services provided by, rather than a person's provision of services to, a public place of accommodation. *Id*.

The Commission also concluded that a place of public accommodation was a place where members of the public are invited upon no condition other than payment of a fixed charge. *Id*.; *cting Neldaughter v. Dickeyville Athletic Club*, ERD Case No. 8900539 (July 31, 1991); *Jones v. Broadway Roller Rink Company*, 136 Wis. 595 (1908) (stating that a place of public accommodation was a place "to which the public were generally invited upon no condition but the payment of a fixed charge."). The Commission, assuming that a coach would be required to meet certain qualifications, concluded that this element of selectivity would cause seeking to coach to not constitute seeking access to a public place of accommodation. *Id*.

In response, Hetz argues that his situation is more akin to a vendor seeking a spot at a farmer's market so that he might provide services to the public. Hetz contends that under the

Case 1:06-cv-00636-WEC   Filed 06/18/07   Page 27 of 30   Document 27

language of the statute, the mere fact that an individual is providing services does not preclude him from protection under the statute. (Pl.'s Br. at 8.)

The defendants concede that a vendor with a disability seeking a spot in a farmer's market falls under the protection of § 106.52 because the market is selling a spot to the vendor in order for him to sell his goods. However, the defendants argue that Hetz's situation is different, as the hospital does not offer the opportunity to provide medical services to the public for sale or otherwise. (Def.'s Reply Br. at 14.)

As an initial matter, Hetz can be seen as seeking access to the hospital as a "place" of accommodation. Unlike the plaintiff in *Barry*, Hetz is not simply trying to gain access to a committee. Rather, Hetz's staff privileges enable him to gain access to the hospital's facilities for his own personal use. Much like a vendor in a public market, Hetz seeks use of the hospital's facilities in order to offer his own services.

Moreover, unlike the plaintiff in *Wolff*, Hetz is gaining access to the hospital's services more than he is providing services to the hospital. The hospital may benefit vicariously, but Hetz receives the monetary benefit of providing services to his patients.

Further, despite the defendants' contention otherwise, the hospital does offer the opportunity to members of the public to provide medical services using their facilities. Although this opportunity is limited to a narrow portion of the public, the hospital offers its facilities for free (or in exchange for the individual assuming the risk for malpractice liability).

However, the fact that this opportunity is limited to a select group of individuals is an important factor under Wisconsin public accommodations law. As noted above, the LIRC has held that a selective process takes the offer of the service outside the realm of access to a public

Case 1:06-cv-00636-WEC   Filed 06/18/07   Page 28 of 30   Document 27

accommodation. Although these cases are not controlling, they are supported by longstanding Wisconsin common law, as well as the language of the statute itself.

The Wisconsin Supreme Court in *Jones* indicated that a primary feature of a place of public accommodation is that it is open to all members of the public with no restriction. Moreover, the statute itself notes that a place of public accommodation is a "place where accommodations, amusement, goods or services are available *either free or for a consideration*." Wis. Stat. § 106.52(e)(1) (emphasis added). This language is in contrast to the language of the ADA, which does not specify the conditions under which the privileges or goods offered by the place must be provided, and which specifically includes entities which are accessible to only a limited segment of the public.[4] The inclusion of the phrase "free or for a consideration" indicates that a place of public accommodation is not simply a place where goods and services are available, but rather a place where these goods and services are freely available.

Such being the case, I conclude that, under Wis. Stat. § 106.52, an entity which uses selective criteria in determining whether an individual may receive access to particular goods or services is not acting as a place of public accommodation in regards to that particular good or service. In this case, because Aurora only offered staff privileges to certain qualified individuals, Aurora was not acting as a public place of accommodation when denying Hetz access to this particular good or service. The defendants' motion to dismiss with regards to Hetz's claim under Wis. Stat. § 106.52 will therefore be granted.

_____

[4]Indeed, as noted above, this provides further support for the proposition that the ADA provides broader protections than the common law public accommodations protections, and that a reliance on common law notions of public accommodations does not properly take into account the increased scope of Title III's protections.

Case 1:06-cv-00636-WEC   Filed 06/18/07   Page 29 of 30   Document 27

## C. Punitive Damages

Hetz's claim of punitive damages is based on the defendants' alleged violation of Wis. Stat. § 106.52. Given that Hetz's claim under this statute will be dismissed, it necessarily follows that his claim for punitive damages must also be dismissed.

## III. CONCLUSION

Hetz has stated a claim upon which relief can be granted under Title III of the ADA. Hetz, as an individual seeking access to the hospital's privileges and facilities for his personal benefit, is protected by Title III. However, under the narrower protections of Wis. Stat. 106.52, Hetz has failed to state a claim upon which relief can be granted because he is not seeking access to a good or service freely offered to the general public.

**NOW THEREFORE IT IS ORDERED** that the defendants' motion to dismiss be and hereby is **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that Counts 1 and 2 of the Complaint be and hereby are **DISMISSED**;

**IT IS FURTHER ORDERED** that on July 9, 2007, at 9:00 a.m. a further scheduling conference will be conducted in Room 253 of the United States Court House, 517 E. Wisconsin Ave., Milwaukee, Wisconsin, to discuss with the parties the steps necessary to further process this case. Parties located over 50 miles from the courthouse may participate by telephone upon request.

**SO ORDERED** this <u>18th</u> day of June 2007, at Milwaukee, Wisconsin.

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge
